UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JESSE CARABAY,

    Plaintiff,

v.

MICHAEL SAYRE, et al.,

    Defendants.

No. C 11-0289 YGR (PR)

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiff alleges that from 2009 to 2010 Defendants, employees of Pelican Bay State Prison, provided constitutionally inadequate medical care for his chronic back pain. Defendants move for summary judgment.[1] For the reasons stated herein, Defendants' motion for summary judgment is GRANTED as to all claims against all Defendants.

## BACKGROUND

The following factual allegations are not disputed, unless specifically noted:

- **February 9, 2009**: Plaintiff saw Nurse Vail concerning his back pain. He told her that the pain started when he bent over to pick up a towel. Thus, she believed that the pain was caused by this motion, and by his Hepatitis-C

---

[1] In his opposition, plaintiff alleges claims regarding events that took place after 2010. The amended complaint, however, discusses events in 2009 and 2010. Accordingly, any claims regarding events after 2010 are not relevant to this action.

treatments.

- **February 10**: Plaintiff was seen by Dr. Agyeman, who prescribed Tylenol-3 for pain.

- **February 20**: Plaintiff was seen by Nurse Vail in response to a complaint of back pain and fatigue. He told her that he had a prescription for Tylenol-3, a pain reliever, for his back pain. Vail visually examined Plaintiff. She noted that his gait was erect, he was able to sit and stand without any observable pain. She thought that his pain may be caused by his Hepatitis C treatment. Vail deferred any further medical treatment because Plaintiff had a doctor's appointment later that same day.

- **March 13**: Vail saw Plaintiff about his request for a renewal of his Tylenol-3 prescription, which she renewed, after consultation with a doctor and examining Plaintiff himself, for another 90 days.

- **August 31**: Vail saw Plaintiff in regard to his complaints of sinus allergies, headaches, bloody noses, nasal discharge, hearing loss, and pain in his ear, neck, jaw and back. She examined Plaintiff, asked about his medical history, noted that he walked with a steady and erect gait, and that he was able to sit and stand without observable pain. Plaintiff answered in the negative to Vail's questions about his symptoms, specifically and whether he had any pain radiating down his legs, muscle spasms, numbness, tingling, or head or back trauma. She discussed the possibilities that the pain was caused by a pinched nerve or slipped spinal disc, but concluded that his back pain resulted from another recent Hep-C treatment. Vail scheduled Plaintiff for a doctor visit and told him to notify staff if his condition worsened.

- **September 23**: Plaintiff was seen by Dr. Williams in response to a complaint of lower back and right foot pain. He asserted that the back pain began several months ago after he bent over to pick up a towel. Williams examined Plaintiff and inquired whether he any weakness, altered sensations or loss of sphincter control. Plaintiff answered no. Williams noted that Plaintiff had no back spasms in the L5-S1 region of the spine or pain in his sciatic notches, and believed that the pain arose from Plaintiff's six months of Hep-C treatment, which can cause rashes, fatigue and hair loss. He prescribed Naprosyn, an analgesic, instructed Plaintiff on back care, and told him to follow up with medical staff as needed.

- **January 1, 2010**: Plaintiff submitted a request to see medical staff.

- **January 4**: Nurse Vail examined Plaintiff, who said that he was not having back spasms, and noted that he had an erect and steady gait, and could sit and stand without difficulty. He asked to change pain medications. Vail instructed him to continue taking the Naprosyn, and notify staff if his condition worsened.

- **January 5**: Dr. Williams agreed with Nurse Vail's suggestion that Plaintiff's spine be x-rayed.

- **January 16**: X-rays were taken. Plaintiff informed nurses that he was in pain.

- **January 20**: Nurse Strehm reviewed the x-rays and told him that he had degenerative disc disease.

- **February 19**: Plaintiff was seen by Dr. Williams for a follow-up visit regarding his lower back pain. They discussed his condition and reviewed his medical history. The x-rays showed mild degenerative disc disease. Plaintiff reported that the medications and other back care had not improved his condition. Williams ordered an MRI, changed his medication to ibuprofen and Pamelor, an antidepressant that can relieve nerve and muscle pain, reinstructed him on back care, and scheduled a follow-up appointment.

- **March 16**: Plaintiff saw Dr. Williams about his lower back pain, and the ineffectiveness and negative side effects of Pamelor. Because the MRI results were not back, Williams could not give Plaintiff more information about his condition. He did change the medication to Trileptal, an anti-seizure medication that can treat nerve-related pain, scheduled Plaintiff for a follow-up in a week's time, and enrolled him in a chronic care protocol program.

- **March 23**: At the follow-up, Williams, who still did not have the MRI results, increased Plaintiff's medication level, in response to Plaintiff's complaints that Trileptal was not helping his back pain.

- **March 30**: At another follow-up, Williams changed Plaintiff's medication back to Pamelor, in response to Plaintiff's complaint that the Trileptal was not helping. The Pamelor dosage was reduced from its previous amount, in the hopes of reducing the side effects of which Plaintiff had complained of. Williams reviewed Plaintiff's MRI results, which showed nerve root compression in two places in the spine. Williams inferred from these results that additional physical therapy was highly unlikely to help. Williams did believe, however, that Plaintiff was a candidate for surgery, which could partially reduce the degree of compression in Plaintiff's spine and alleviate some of his pain. Williams thus informed Plaintiff of these facts and let him consider whether he wanted to pursue surgical treatment or continue on with only pain medications. Plaintiff did not elect surgical treatment at this appointment but stated that he would consider the option.

- **April 8**: Plaintiff was seen by Nurse Madison. He told her that he had stopped taking Pamelor because it was ineffective and had unpleasant side effects. He also asked her to call Dr. Williams. Madison discussed Pamelor, and suggested that he stop taking it until his next appointment with Williams on April 13, and recommended that he take ibuprofen. She reminded him that he was a candidate for surgery, and stated that she would inform Williams about his pain medications. After meeting with Madison, Williams said he would adjust Plaintiff's medications at their April 13th appointment.

- **April 13**: As planned, Plaintiff met Dr. Williams, who reminded Plaintiff that he was a candidate for surgery, an option Plaintiff took. Williams prepared the paperwork to obtain an outside prison consult, arranged to see Plaintiff again after the consult, and discontinued the Pamelor, replacing it with ibuprofen and Tylenol-3.

- **June 16**: Plaintiff had a neurological surgical consult with an outside physician, Dr. Gumshield Saleh. Saleh recommended in his written report that surgery was the only viable option. Williams reviewed the report, and made arrangements for Plaintiff to have surgery.

- **July 21**: Plaintiff failed to show up at a scheduled appointment with Williams

to discuss the surgical consult.

- **<u>August 9</u>**: Plaintiff had another MRI taken of his spine. He underwent back surgery with the understanding that it was being done without any guarantees that his condition would improve.

- **<u>August 17</u>**: Plaintiff was seen by Nurse Vail for a post-surgical follow-up appointment. Plaintiff complained that he was still experiencing pain and numbness. Nurse Vail reviewed Dr. Saleh's medical reports and saw that no orders for a post-surgical follow-up visit with Dr. Saleh, and that only wound care treatment, pain medications, and physical therapy had been recommended.

- **<u>August 19</u>**: Before this appointment, Dr. Williams reviewed the medical notes of Dr. Saleh and Dr. Nancy Adam, just as Nurse Vail had done. Williams read that Saleh recommended rehabilitation and pain medications in his postsurgical notes. Adam's notes from August 13 and 16, 2010, showed that she contacted Saleh in order to find out what kind of post-surgical rehabilitation treatment Plaintiff should receive, and further documented that Saleh recommended wound treatment at the surgical site and twelve sessions of physical therapy to help improve paraspinal muscle spasms, with hamstring stretching exercises as well. Williams did not see that there was any recommendation or request from Saleh for Plaintiff to return his office for a post-surgical follow-up.

- **<u>August 19</u>**: Plaintiff failed to show up for an appointment with Dr. Williams, who would have discussed post-surgical rehabilitation.

- **<u>August 24</u>**: Plaintiff started physical therapy. He received twelve sessions, one per week.

- **<u>September 10</u>**: Plaintiff was seen by Nurse Vail in response his complaints that he experienced a sharp pain in his back the night before, and he complained of continued pain in his feet post-surgery. After consulting with Dr. Adam, Vail instructed Plaintiff to continue taking his pain medications, use warm and cool compresses, and perform such exercises as he could tolerate.

- **<u>October 14</u>**: Plaintiff was seen by Nurse Vail for a follow-up appointment after he completed twelve sessions of physical therapy. Plaintiff asked for an extra mattress, per his physical therapist's recommendations. Vail told him that such request would likely not be granted because the recommendation had not come from PBSP doctors or by Dr. Saleh. Plaintiff then asked to see a PBSP physician and Saleh. Vail scheduled an appointment with a PBSP doctor.

- **<u>October 26</u>**: Plaintiff was seen by Dr. Williams, who gave Plaintiff a prescription for acetaminophen with codeine to help alleviate his pain.

- **<u>December 9</u>**: Plaintiff was seen by Nurse Vail regarding his request for a post-surgical follow-up appointment with Dr. Saleh. Vail informed Plaintiff that such request had been denied because his post-surgical condition was as expected following surgery. She reminded Plaintiff that Saleh expressly stated in his reports that complete relief or even improvement of Plaintiff's symptoms was not guaranteed.

**DISCUSSION**

**I.     Standard of Review**

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue for which the opposing party by contrast will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id*. If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323.

## II.  Claims

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical needs and the nature of the defendant's response to those needs.  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (overruled on other grounds, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc)).

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it.  *Farmer v. Brennan*, 511 U. S. 825, 837 (1994) (equating standard with that of criminal recklessness).  The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference."  *Id.*  Consequently, in order for deliberate indifference to be established, there must exist both a purposeful act or failure to act on the part of the defendant and harm resulting therefrom.  *See McGuckin*, 974 F.2d at 1060.

In order to prevail on a claim of deliberate indifference to medical needs, a Plaintiff must establish that the course of treatment the doctors chose was "medically unacceptable under the circumstances" and that they embarked on this course in "conscious disregard of an excessive risk to Plaintiff's health."  *See Toguchi v. Chung*, 391 F.3d 1051, 1058–60 (9th Cir. 2004).  A claim of mere negligence related to medical problems, or a difference of opinion between a prisoner patient and a medical doctor, is not enough to make out a violation of the Eighth Amendment.  *Id.*; *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).

Plaintiff has not shown a genuine dispute as to any material fact.  Against the lengthy and undisputed medical record related above, Plaintiff asserts in his opposition that his first amended complaint demonstrates that Defendants were deliberately indifferent.  (Pl.'s Opp. to MSJ at 7.)  According to Plaintiff, Defendants "were deliberately ignoring his serious

medical needs by inferring that there was nothing seriously wrong with him and associating his chronic and substantial pain with their personal experience of back pain, including deferring any tests or examinations." (*Id.*). However, neither the amended complaint nor the opposition shows a genuine issue of material fact. The undisputed record shows that from February 2009 to December 2010, Plaintiff had over 20 appointments with physicians and nurses, who examined him, listened to his complaints, reviewed his medical history, and provided medications and other treatments, adjusting such treatments as necessary. Plaintiff also received a consult from an outside physician, and received back surgery, further medications, physical therapy, and follow-up appointments. These actions show that Defendants were aware of Plaintiff's condition, and sought to treat it, rather than reflecting deliberate indifference. Even if, as plaintiff asserts, the diagnoses were incorrect, such conduct constitutes at worst negligence or gross negligence, neither of which constitutes deliberate indifference. *See Farmer*, 511 U.S. at 835–36 & n.4. Also, even if the medications were, as plaintiff alleges, inadequate to eliminate or reduce the pain, Plaintiff still has not shown that the treatment was "medically unacceptable under the circumstances" and was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Toguchi*, 391 F.3d at 1058. It appears that physicians were attempting various methods of treatment, in further attempts to treat plaintiff's condition. Also, that officials did not act as quickly as Plaintiff desired is not sufficient to demonstrate deliberate indifference. *Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) (a delay in treatment that is not within the doctor's control does not constitute deliberate indifference). The record shows that medical staff responded to Plaintiff's appointment requests without any great delay, including his requests for renewed medication.

Third, and finally, the Constitution does not require that defendants provide plaintiff with successful or perfect treatment. It requires only that they are not deliberately indifferent. That Defendants could not stop Plaintiff's pain entirely is not sufficient to show deliberate indifference. They were aware of his condition and sought to treat it with

appropriate measures. Accordingly, the motion for summary judgment is GRANTED in favor of all Defendants as to all claims.

## CONCLUSION

Plaintiff having failed to show that there are triable issues of material fact as to any of his claims, Defendants' motion for summary judgment (Docket No. 38) is GRANTED as to all claims against Michael Sayre, Claire Williams, Kay Vail, and Nancy Madison. The Clerk shall enter judgment in favor of these persons as to all claims, terminate Docket No. 38, and close the file.

**IT IS SO ORDERED**.

DATED: March 31, 2013

**Y**VONNE **G**ONZALEZ **R**OGERS
**U**NITED **S**TATES **D**ISTRICT **C**OURT **J**UDGE